# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
PEDE, COOK, and HAIGHT
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Captain GREGORY A. MARTIN**
**United States Army, Appellant**

ARMY 20110345

Headquarters, 82d Airborne Division
Patrick J. Parrish, Military Judge
Colonel Lorianne M. Campanella, Staff Judge Advocate

For Appellant: William E. Cassara, Esquire (argued); Captain John L. Schriver, JA; William E. Cassara, Esquire (on brief).

For Appellee: Captain Benjamin Hogan, JA (argued); Colonel John P. Carrell, JA; Lieutenant Colonel James L. Varley, JA; Major Robert A. Rodrigues, JA; Captain T. Campbell Warner, JA (on brief).

28 February 2014

---------------------------------------
MEMORANDUM OPINION
---------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

HAIGHT, Judge:

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of attempted rape, one specification of attempted aggravated sexual contact, one specification of rape, and one specification of aggravated sexual contact,[1] in violation of Articles 80 and 120, Uniform Code of Military Justice, 10 U.S.C. §§ 880 and 920 (2006 & Supp. III 2010) [hereinafter

---

[1] The military judge also found appellant guilty of an additional specification of aggravated sexual contact and one specification of wrongful sexual contact. However, these specifications were dismissed after findings but before sentencing as an unreasonable multiplication of charges.

UCMJ]. The convening authority approved the adjudged sentence of a dismissal and confinement for six years.

The case is now before this court for review under Article 66, UCMJ. Appellant raises three assignments of error to this court. Two assignments of error warrant discussion, one of which merits relief.

## BACKGROUND

On the evening of 29 October 2010, appellant returned to Fayetteville, North Carolina from his post-deployment leave in Texas. Appellant flew from Houston to Charlotte, and then to Raleigh, where he retrieved his personal vehicle and drove to Fayetteville. When he reached Fayetteville, he purchased a number of items for a Halloween party that evening, which was hosted by two other captains in his battalion. Appellant drove to the gathering, and after donning his costume in his vehicle, he entered the apartment and joined the party. Among those in attendance at the party were Second Lieutenant (2LT) MF, First Lieutenant (1LT) MR, and Captain (CPT) KV.

Appellant had worked with and was friends with 1LT MR and CPT KV but had never met 2LT MF until that evening. Appellant immediately began consuming beverages containing hard alcohol and interacting with other guests at the party, including 2LT MF. Additionally, 2LT MF, 1LT MR, and CPT KV all consumed various alcoholic beverages, socialized, and played charades. After a few hours—at approximately 2300—the four of them got a taxicab to take them to another party hosted by a friend of 2LT MF. After failing to find the next party, 2LT MF informed the others that she did not feel well and wanted to return to 1LT MR's apartment, where she planned to retire for the evening.

The taxicab proceeded to 1LT MR's apartment complex. Upon arrival, all four occupants as well as the cab driver went into 1LT MR's apartment. Appellant and the cab driver used the bathrooms. First Lieutenant MR made up the bed in the master bedroom for 2LT MF, and 2LT MF fell asleep there shortly after the others returned to the taxicab to continue the night's festivities.

Appellant, CPT KV, and 1LT MR proceeded in the taxicab to a bar in downtown Fayetteville, during which time appellant was noticeably intoxicated. When they arrived at the bar, CPT KV and 1LT MR realized appellant had forgotten his wallet and identification, at which point one of them gave the cab driver money to take appellant back to 1LT MR's apartment, where she had left a blanket and pillow for him to sleep on the couch. By this point, approximately midnight, appellant was highly intoxicated. He began vomiting out the passenger window of the taxicab as soon as it departed the bar, and shortly thereafter, either passed out or fell asleep for the remainder of the trip back to 1LT MR's apartment complex. The

cab driver testified that he had seen a lot of intoxicated people, and appellant was "one of the worst ones I have ever seen."

Upon returning to the apartment complex at approximately 0015, appellant and the driver were waved through the gate by a security guard whom 1LT MR had already telephonically notified that appellant would be returning via taxicab. The cab driver roused appellant when he parked outside 1LT MR's unit, which was near the guard's station. Appellant exited the vehicle and began knocking on the door to the apartment. Initially there was no response, and the cab driver observed that appellant was bracing himself against the door while he awaited entry. At some point, appellant was making such a commotion that the gate guard left her station and approached 1LT MR's apartment, where she witnessed appellant staggering around, slurring his speech, and pounding on the door to the unit. Both the cab driver and the gate guard observed appellant lose his balance and tumble face-first into a nearby bush. The cab driver testified that appellant did not even attempt to catch himself as he fell, but when he got back to his feet it appeared that the fall woke him up to some degree.

Eventually, the gate guard returned to her station after the cab driver told her that he would remain with appellant a bit longer. Shortly thereafter, at approximately 0045, 2LT MF was awakened by appellant's repeated banging on the door. She got out of 1LT MR's bed and proceeded downstairs where she opened the door and discovered appellant leaning on the doorframe. Appellant entered the apartment and repeatedly thanked 2LT MF for opening the door. She noticed that appellant sounded and appeared drunk as he stumbled quickly up the stairs and into the bathroom adjacent to the master bedroom. At this point, 2LT MF returned to bed, although she was somewhat perplexed by appellant's arrival. She had not been expecting appellant to return to the apartment by himself and hoped he would just use the bathroom and go to sleep on a couch in another room. This did not happen.

Appellant was in the bathroom for several minutes, during which time 2LT MF got under the covers of 1LT MR's bed and started to doze off again. She testified that she was lying on her left side with her back towards the bathroom when appellant unexpectedly "flopp[ed]" onto the bed. Second Lieutenant MF explained that appellant's forehead collided with hers, waking her from her sleep and "froze" her with fear as she did not think he was going to "climb into bed." Next, appellant got up, turned off the lights, and immediately returned to the bed.

Second Lieutenant MF testified that as appellant lay there, she tried to pretend she was asleep so he would leave her alone. But, after "maybe a minute," appellant leaned towards her and attempted to kiss her. She told appellant "no," and he apologized and moved away. After another minute, he attempted to kiss her again, at which point she told him "no" again, and he again apologized. After another brief pause, appellant began engaging in a series of more aggressive and unwelcomed advances, resulting in multiple sexually abusive acts.

3

Appellant rolled over and trapped 2LT MF under his body weight.[2] Additionally, throughout this encounter, appellant used his arms and legs to restrain 2LT MF. Overcoming her attempts to push him away, appellant put his hand underneath 2LT MF's blouse and bra and forcefully grabbed her chest and kissed her now exposed breasts. Despite the continued resistance and pleas for him to stop, appellant forced his hand underneath 2LT MF's spandex shorts and digitally penetrated her vagina. She cried and begged for him to stop, but appellant did not acknowledge her protests and continued. Second Lieutenant MF was unable to get appellant to remove his hand as he was too strong. Appellant then removed his hand, proceeded to masturbate, and then went back to digitally penetrating 2LT MF's vagina. This pattern of digital rape, momentarily rolling off his victim to masturbate his erect penis, and then returning for more digital penetration repeated itself several times.

Between the third and final instances of completed digital rape, appellant unsuccessfully tried to get 2LT MF to engage in other sexual behavior. These failures form the bases for the two attempt specifications. Specifically, appellant wanted 2LT MF to grab his exposed penis and invited her to "get on top," presumably so they could engage in sexual intercourse. At this point in her testimony, 2LT MF testified that she believed appellant was going to "rape" her.

During the fourth and final digital rape, 2LT MF went into "survival mode" and decided she would flee, despite the risk of inciting appellant's anger, at the next opportunity. So, when appellant next rolled off her and started masturbating again, she escaped. Second Lieutenant MF got up from the bed, calmly walked out of the room, and closed the door behind her. At this point, she scrambled downstairs, grabbing her wallet, keys, and coat.

She left the apartment without putting her shoes on and immediately called her platoon sergeant to report what had happened.[3] When her platoon sergeant did not answer, 2LT MF got into her vehicle and called her company commander. By this point, 2LT MF was "crying hysterically" and when she told her commander she had been assaulted, he directed her to call 911.

Second Lieutenant called 911 at approximately 0200 and spoke with a dispatcher as she drove towards her own apartment on Fort Bragg.[4] The dispatcher explained that she would send officers to the scene and asked 2LT MF to return to the apartment complex. When police arrived, 2LT MF gave an account of what

---

[2] Appellant outweighed 2LT MF by approximately sixty-five pounds.
[3] Second Lieutenant MF had left her cell phone in her coat pocket.
[4] A recording of the 911 call, during which 2LT MF reported what had happened, was admitted as Prosecution Exhibit 1.

happened, and identified the apartment unit in which the incident occurred. Second Lieutenant MF then called her fiancé and left him a voice message.

At trial, appellant testified that he could not recall various periods throughout the evening after leaving the first party. He claimed that he could not recall the cab ride to the bar, but that he had a "moment of clarity" from which he remembered waiting outside 1LT MR's apartment with the cab driver. He stated he could not remember entering the apartment or any of the events that transpired until he was awakened by the police's arrival. He did have a "foggy memory of trying to kiss a woman on like the shoulder and her very coyly saying, 'No, no, no.'"

## LAW AND DISCUSSION

This court "may affirm only such findings of guilty . . . as it finds correct in law and fact." UCMJ art. 66(c). "We must conduct an independent review of both the legal and factual sufficiency of the evidence. In doing so, our court reviews de novo the legal and factual sufficiency of the case." *United States v. Gilchrist*, 61 M.J. 785, 793 (Army Ct. Crim. App. 2005). Our test for legal sufficiency "requires [this court] to review the evidence in the light most favorable to the Government [and] [i]f any rational trier of fact could have found the essential elements beyond a reasonable doubt, the evidence is legally sufficient." *United States v. Brooks*, 60 M.J. 495, 497 (C.A.A.F. 2005). The test for factual sufficiency is "whether, after weighing the evidence of record and making allowances for not having personally observed the witnesses, we are convinced of appellant's guilt beyond a reasonable doubt." *Gilchrist*, 61 M.J. at 793 (citing *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)).

1. *Completed Offenses of Rape and Aggravated Sexual Contact*

In his second assignment of error, appellant alleges:

> THE EVIDENCE IS LEGALLY AND FACTUALLY
> INSUFFICIENT TO SUPPORT THE FINDINGS OF
> GUILTY FOR RAPE IN SPECIFICATION 1 OF CHARGE
> II AND FOR AGGRAVATED SEXUAL CONTACT IN
> SPECIFICATION 2 OF CHARGE II.

Appellant was found guilty of rape by "inserting his fingers into [2LT MF's] vagina, by using restraint applied to her leg and torso, sufficient that she could not avoid or escape the sexual conduct." Additionally, he was found guilty of aggravated sexual contact for "placing his mouth and hands on the breast of [2LT MF] . . . by using restraint applied to her leg and torso, sufficient that she could not avoid or escape the sexual conduct."

*Actus Reus and Mens Rea*

With respect to the offense of rape, the government was required to prove that appellant (1) caused 2LT MF to engage in a sexual act; and (2) by force. *See Manual for Courts-Martial*, *United States* (2008 ed.) [hereinafter *MCM*] pt. IV, ¶ 45.b(1)(a). The testimony of 2LT MF clearly established that appellant used force against her during the multiple instances that he penetrated her vagina with his fingers. Specifically, 2LT MF testified that appellant "pin[ned] down my left knee against the bed with his . . . right elbow. He . . . went through the top of my shorts . . . right underneath my shorts and underwear and that's when he penetrated me with his fingers." She further explained that she attempted to remove his hand from her underwear, but "he wasn't budging at all."

Regarding the offense of aggravated sexual contact, the government was required to prove that appellant (1) engaged in a sexual contact with 2LT MF; and (2) appellant did so by using force against her. *See MCM*, pt. IV, ¶ 45.b(5)(a). Second Lieutenant MF's testimony also proved that appellant used force to commit the sexual contact of touching her breast with his hands and mouth. She testified that appellant pulled her blouse and bra down, and "started . . . [to] forcefully kind of grab my chest and was still trying to kiss . . . my neck . . . [and he] started kissing my—like over my chest and over the nipple . . . ."

We have no doubt appellant's actions satisfied the requirements for each of these specifications. However, because this particular rape offense entails a "sexual act" that does not involve contact between the penis and the vulva, the government was also required to establish the specific *mens rea* applicable to the *actus reus* described by *MCM*, pt. IV, ¶ 45.a(t)(1)(B).[5] Specifically, it had to prove that when appellant inserted his finger into 2LT MF's vagina, he possessed the specific intent to "abuse, humiliate, harass, or degrade any person, or to arouse or gratify the sexual desire of any person." *MCM*, pt. IV, ¶ 45.a(t)(1)(B). The same proof requirements applied to the aggravated sexual contact offense, where "sexual contact" is "the intentional touching, either directly or through the clothing, of the . . . breast . . . of another person . . . with an intent to abuse, humiliate, or degrade any person or to arouse or gratify the sexual desire of any person." *MCM* pt. IV, ¶ 45.a(t)(2).

*Affirmative Defense: Voluntary Intoxication*

"An accused may . . . raise voluntary intoxication, or partial mental responsibility to refute a specific intent *mens rea* element of an offense." *United*

---

[5] When a "sexual act" consists of "contact between the penis and the vulva" there is no specific intent requirement. *See MCM*, pt. IV, ¶ 45.a(t)(1)(A).

*States v. Hearn*, 66 M.J. 770, 776 (Army Ct. Crim. App. 2008) (internal citations and quotation marks omitted) (citing *United States v. Axelson*, 65 M.J. 501, 513-14 (Army Ct. Crim. App. 2007)). *See also* Rule for Courts-Martial [hereinafter R.C.M.] 916(l)(2). To raise the defense, an accused must show more than just alcohol consumption or intoxication. Rather, "there must be some evidence that the intoxication was of a severity to have had the effect of rendering the appellant incapable of forming the necessary intent, not just evidence of mere intoxication." *United States v. Peterson*, 47 M.J. 231, 233-34 (C.A.A.F. 1997) (quotation marks and citation omitted). If an accused is able to muster some evidence of the defense of voluntary intoxication, the government may overcome this affirmative defense by proving beyond a reasonable doubt that it did not exist. R.C.M. 916(b)(1).

As discussed above, the offenses of rape and aggravated sexual contact each included a specific intent element. Here, there was ample evidence that appellant not only ingested a significant amount of alcohol, but that his intoxication was to a degree that it could have possibly affected his ability to form the specific intent necessary to prove the charged crimes. Thus, the defense of voluntary intoxication was in issue, placing the burden on the government to prove beyond a reasonable doubt the defense did not exist. We find the evidence proved beyond a reasonable doubt that appellant's intoxication did not prevent him from forming the specific intent required by *MCM,* pt. IV, ¶¶ 45.a(t)(1)(B), 45.t(2), and that he did, in fact, form that very intent required for the completed offenses.

Second Lieutenant MF's testimony provided an abundance of evidence that appellant's actions were aimed specifically at gratifying his sexual desires. First of all, the entire episode occurred at night and in a bed. Appellant turned off the lights before making advances towards a goal which was clearly sexual in nature. He attempted to kiss 2LT MF twice before he began "caressing [her] side." This was followed by appellant touching 2LT MF's breasts, which she testified was accompanied by him making "moaning sounds." Further, while appellant's fingers were inside her vagina, 2LT MF could feel "his penis hard against my leg." After that, he paused briefly to "caress[] his penis" and "masturbate" before he forcibly penetrated her vagina with his fingers again. Next, appellant pulled his pants down to his ankles and resumed masturbating his erect penis before he rolled over so that 2LT MF could "feel his penis against [her] leg."

Here, in rejecting appellant's arguments that his voluntary intoxication precluded his ability to form the requisite intent for the charged offenses, the military judge made special findings concluding that appellant "was capable of comprehending the circumstances and formulating a response . . . and sufficiently aware of his surroundings and what he was doing that he masturbated his erect penis." Further, the military judge specifically noted that "the court has considered all of the evidence and has followed the same instructions it would have provided to members on voluntary intoxication." *Cf. Hearn*, 66 M.J. 770. (This court set aside the specific intent offense of indecent acts with a child where evidence of substantial

7

alcohol consumption by accused was presented, but the military judge *failed to provide* a voluntary intoxication instruction.).[6] For the completed offenses of rape and aggravated sexual contact, we reach the same conclusions as the military judge, and therefore hold that the evidence is legally and factually sufficient with respect to these convictions.

2.  *Attempted Rape and Attempted Aggravated Sexual Contact*

In his first assignment of error, appellant alleges:

> THE EVIDENCE IS LEGALLY AND FACTUALLY INSUFFICIENT TO SUPPORT THE FINDING OF GUILTY FOR ATTEMPTED RAPE IN SPECIFICATION I OF CHARGE I AND FOR ATTEMPTED AGGRAVATED SEXUAL CONTACT IN SPECIFICATION 2 OF CHARGE I WHERE THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT HAD THE SPECIFIC INTENT TO COMMIT THE OFFENSES.

Appellant was found guilty of attempted rape by attempting to "cause [2LT MF] to engage in a sexual act, to wit: inserting his penis into her vagina, by using restraint applied to her leg and torso, sufficient that she could not avoid or escape the sexual conduct." Additionally, he was found guilty of attempted aggravated sexual contact by attempting to "cause [2LT MF] to engage in sexual contact, to wit: touching his penis with her hand, by using strength applied to her hand, sufficient that she could not avoid or escape the sexual conduct."

*Actus Reus and Mens Rea*

The specifications of attempted rape and attempted aggravated sexual contact, in violation of Article 80, UCMJ, required the government to prove:

(1) that the accused did a certain overt act;

---

[6] In *Hearn*, this court did not hold that evidence connecting an accused's intoxication to his ability to form a specific intent to gratify his sexual desires was a per se defense, but merely that "a properly instructed panel *may have believed* appellant could not form the requisite intent because of the effects of his heavy consumption of alcohol and inability to recollect events of the charged offense." 66 M.J. at 777-78 (emphasis added).

(2) that the act was done *with the specific intent to commit a certain offense* under the code [here rape and aggravated sexual contact];

(3) that the act amounted to more than mere preparation; and,

(4) that the act apparently tended to effect the commission of the intended offense [here rape and aggravated sexual contact].

*MCM*, pt. IV, ¶ 4.b. (emphasis added). With respect to the intended offenses, the government must prove that, at the time of the overt acts, appellant intended *every element* of each offense. *United States v. Guzman*, ARMY 20100020, 2013 WL 5410012, at *10 (Army Ct. Crim. App. 20 Sep. 2013) (mem. op.) *pet. denied* __ M.J. __ (C.A.A.F. 29 Jan. 2014). Thus, for the offense of attempted rape, the government was required to prove that appellant (1) intended to cause 2LT MF to engage in a sexual act (vaginal intercourse); and, (2) intended to do so by using force[7] (application of sufficient restraint) against 2LT MF. *MCM*, pt. IV, ¶ 45.b(1)(a). For the offense of attempted aggravated sexual contact, the government was required to prove that appellant (1) intended to engage in sexual contact (causing 2LT MF to touch appellant's penis) with 2LT MF; and, (2) intended to do so by using force (application of sufficient strength) against 2LT MF. *MCM*, pt. IV, ¶ 45.b(5)(a).

With respect to the attempted aggravated sexual contact, 2LT MF testified appellant had pulled his pants down to his ankles. At one point, appellant "tried to get [2LT MF] to grab his penis" by saying, "Here, grab this." Appellant grabbed 2LT MF's wrist and tried to "pull it over" but was unable to do so because she yelled "No" and successfully "pulled [her] hand back." At that time, appellant said, "Okay, well then get on top," to which she also responded "No." As appellant was

---

[7] One definition of "force" is the compelled submission of another or the overcoming or prevention of another's resistance by "physical violence, strength, power, or restraint applied to another person, sufficient that the other person could not avoid or escape the sexual contact." *MCM*, pt. IV, ¶ 45.a(t)(5)(C). Both rape and aggravated sexual contact can be committed by various means, including force, causing grievous bodily harm, threats of death or grievous bodily harm, and rendering another person unconscious, among others. *MCM*, pt. IV, ¶¶ 45.a(a), (e). Here, based on the language of the attempt specifications and the relevant definitions provided by the *MCM*, the government was clearly prosecuting under the theory that appellant attempted to commit the offenses by force. *MCM*, pt. IV, ¶ 45.a(t)(5).

unable to "climb on top of" 2LT MF, he proceeded to digitally penetrate her vagina yet again.

Appellant's efforts to pull 2LT MF's hand towards his penis as well as his efforts to persuade her to "get on top" along with his brief attempt to position his body atop her and between her knees are overt acts amounting to more than mere preparation to engage in a sexual contact and sexual act, respectively. Thus, the *actus reus* of each attempt specification has been satisfied, and the only question remaining is whether appellant possessed the required specific intent to commit those acts by force. Surely, appellant wanted 2LT MF to touch his penis and wanted to engage in sexual intercourse with her. Therefore, in conducting our legal and factual sufficiency review, we are left to determine whether appellant specifically intended to accomplish each of these acts via compelled submission.

Here, we find appellant's convictions for attempted rape and attempted aggravated sexual contact are legally sufficient. Viewing the evidence in the light most favorable to the government, a rational fact finder could have found appellant guilty of these offenses. *See Brooks*, 60 M.J. at 497. However, under the specific facts and circumstances of this case, we are not convinced beyond a reasonable doubt that appellant possessed the specific intent to have sexual intercourse and cause a sexual contact *by force*.

In *United States v. Polk*, the Air Force Court of Military Review carefully explored the proof requirements for attempted rape "by force and without consent" of the victim. 48 C.M.R. 993, 997 (A.F.C.M.R. 1974). In that case, the accused had removed his clothes, broken into a woman's bedroom in the middle of the night, climbed on top of her, placed his hand on her throat, and told her that he would not leave until she "let him have her." *Id.* at 996 (internal quotation marks omitted). Only after the victim's persistent pleas for Polk to leave, in spite of his repeated demands that she "yield to his desires," did he finally climb off the victim and exit her home without further assaulting her. *Id.* at 995. In setting aside Polk's conviction for attempted rape, the Air Force Court observed that:

> The circumstances unquestionably establish that at the least the accused intended to gratify his lust and sexual desires by having sexual intercourse with the victim, and that he unlawfully entered her home for that purpose. It is also clear that had the victim acquiesced to his desires because of her fear, and apprehension of injury induced by the apparent show of force, there would have been no legitimate consent, and the crime of rape would have been committed.

*Id.* at 996. However, the court also noted that "conviction of attempt requires proof of an overt act coupled with a specific intention to commit a substantive offense . . .

. [T]he specific intention to commit the substantive offense and the overt act must each be proven by the evidence, and proof of the overt act alone cannot be 'boot strapped' up to prove also the specific intent required." *Id.*

The court explained that the government was required to prove not only the accused's desire to have sexual intercourse, but to do so "by force and without her consent." *Id.* at 997. Ultimately, the Air Force Court concluded:

> [T]he evidence does not show that the accused intended to have intercourse with the victim without her permission and assent. . . . When he saw her refusal to consent was final, he left. . . . [D]esistance and flight in the face of resistance to a sexually inspired assault may, in itself, indicate that the assailant does not intend to effect intercourse by force.

*Id.*

In *United States v. Sampson*, this court was confronted with a factual scenario similar to *Polk*. 7 M.J. 513 (A.C.M.R. 1979).[8] The accused, while partially dressed, broke into the on-post home of the victim and confronted her in her bathroom where she was standing nude after getting out of the shower. *Id.* at 516. When Sampson reached toward the victim's neck and shoulders, she screamed and he darted from the home with the victim's husband in pursuit. In conducting its factual sufficiency review, the court noted that it was required to:

> [C]arefully review[] the record for: (1) proof beyond a reasonable doubt that the appellant committed an overt act tending toward the completion of rape, which amounted to more than mere preparation; and (2) proof beyond a reasonable doubt of the appellant's concurrent *specific intent* to commit rape as required for the offense of attempted rape.

*Id.* at 516. In setting aside Sampson's conviction for attempted rape, the Army Court found that:

> Although . . . there is sufficient evidence of an overt act *tending* toward the completion of rape, which amounts to more than mere preparation, we do not find sufficient

---

[8] While the elements of rape under Article 120, UCMJ, have changed over time, we refer to these cases for their relevant discussion of the concept of "force."

> proof beyond a reasonable doubt that the appellant had the specific intent required for the offense of attempted rape, *i.e.*, that the appellant intended to have sexual intercourse with a woman not his wife by force and without her consent where he intended to overcome any resistance by force, active or constructive, and to penetrate the woman's person.

*Id.* Citing *Polk*, 48 C.M.R. 993, the Army Court explained that a "generalized evil desire [for sexual gratification] is not sufficient to establish the specific intent required to prove an attempted rape." *Id.* at 516. It concluded:

> If the evidence is not sufficient to prove beyond a reasonable doubt that the accused ever formed an intention to overcome whatever resistance he might meet, he cannot be convicted of attempted rape. Since there is no clear-cut indication that he intended to overcome [the victim] and rape her, we cannot conclude beyond a reasonable doubt that the appellant is guilty of attempted rape.

*Id.*

Here, as in *Polk* and *Sampson*, we do not conclude beyond a reasonable doubt that appellant possessed the specific intent to overcome whatever resistance he might have met from 2LT MF in order to cause her to touch his penis or have sexual intercourse with him. Rather, with respect to the attempted aggravated sexual contact, 2LT MF's testimony established that she was able to dissuade appellant with a limited amount of effort before he abandoned that endeavor in order to next try and persuade her to have sexual intercourse with him. Fortunately, this effort failed too. Apparently, 2LT MF was able to deter him with a simple refusal and kicking her "knees up."[9] However, appellant responded by returning to the crime of

---

[9] A victim's ability to successfully fend off an assailant does not foreclose a successful attempted rape by "using force" prosecution. However, the amount of physical action exercised by the accused and the degree of resistance by the victim necessary to frustrate the accused's attempts are relevant, among other factors, and must be carefully analyzed to determine if he possessed the requisite intent to engage in sexual conduct by force. Other factors might include words or threats of the attacker, or the presence of weapons or other criminal tools. *See United States v. Graves*, 47 M.J. 632 (Army Ct. Crim. App. 1997) (conviction for attempted rape sustained despite no testimony or physical evidence of sexual assault where accused had prepared prussic handcuffs on a bed in the room to which he tried to take the victim after brutally assaulting and abducting her).

(continued . . .)

digital rape. In other words, appellant's "desistance" from his efforts to get 2LT MF to touch his penis or have sexual intercourse with him occurred when he immediately moved on to another sexual offense, for which the government secured conviction.[10]

In its charging decision, the government elected to parse appellant's conduct into a range of discrete criminal acts and offenses. In doing so, with respect to the attempts, the government created the opportunity to convict appellant of more offenses and increase his punitive exposure.[11] However, this choice also increased its own burden to prove every element of all charged offenses beyond a reasonable doubt. Here, we ourselves are not convinced of the factual sufficiency of the convictions of attempted rape and attempted aggravated sexual contact.

## CONCLUSION

On consideration of the entire record and the assigned errors, the findings of guilty of Charge I and its two specifications are set aside and those specifications and charge are dismissed. The remaining findings of guilty are AFFIRMED.

We are able to reassess the sentence on the basis of the error noted and do so after conducting a thorough analysis of the totality of the circumstances presented by appellant's case, and in accordance with the principles articulated by our superior court in *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013) and *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986).

In evaluating the *Winckelmann* factors, despite dismissing two serious sexual offenses which each carried a maximum sentence of confinement for twenty years, we still find no dramatic change in the penalty landscape or exposure which might cause us pause in reassessing appellant's sentence as one of the remaining offenses, the completed digital rape, allowed a maximum sentence of confinement for life. Second, appellant elected to contest his offenses before, and be sentenced by, a court-martial consisting of a military judge alone. Third, we find the nature of the remaining offenses captures the gravamen of the original specifications, and the

---

(. . . continued)

[10] Despite 2LT MF's account that appellant digitally penetrated her on multiple occasions throughout the ordeal, the government only charged him with a single specification of rape by digital penetration, instead of employing the common charging language of "on divers occasions."

[11] Although the government did charge the attempted crimes separately, curiously it did not elect to charge separately the multiple instances of digital rape.

circumstances surrounding appellant's conduct remain admissible with respect to the remaining offenses. All of the misconduct occurred on one occasion, at the same location, and against the same victim. Finally, based on our experience, we are familiar with the remaining offenses so that we may reliably determine what sentence would have been imposed at trial.

Reassessing the sentence based on the noted errors and the entire record, we AFFIRM only so much of the sentence as provides for a dismissal and confinement for five years. We find this reassessed sentence is not only purged of any error but is also appropriate. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the findings and sentence set aside by this decision, are ordered restored. *See* UCMJ arts. 58b(c) and 75(a).

Chief Judge PEDE and Senior Judge COOK concur.

FOR THE COURT:

ANTHONY O. POTTINGER
Chief Deputy Clerk of Court

14